## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DAVID P. HAYES, TRUSTEE FOR THE PAUL B. HAYES FAMILY TRUST, DATED APRIL 30, 2010**<br><br>　　　**Plaintiff,**<br><br>**v.**<br><br>**DEB HALLAND, in her official capacity as Secretary of the United States Department of the Interior, the UNITED STATES BUREAU OF INDIAN AFFAIRS, DARRYL LACOUNTE, in his official capacity as Director of the United States Bureau of Indian Affairs, WARRIOR EXPLORATION & PRODUCTION, LLC, and PERFORMANCE GROUP, LLC**<br><br>　　　**Defendants.** | **4:16-cv-00615-JAR-CDL** |

## <u>OPINION AND ORDER</u>

Jane A. Restani, Judge[*]:

     This case involves the second attempt by the Bureau of Indian Affairs ("BIA") to comply with the National Environmental Policy Act of 1969 ("NEPA") while approving oil and gas leases in Osage County, Oklahoma.  In the first challenge, brought by the Paul B. Hayes Family Trust, Dated April 30, 2010 ("Hayes"), the court

---

[*] Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

invalidated a lease and associated drilling permits on the Hayes property and remanded the matter to the United States Bureau of Indian Affairs ("BIA"). Hayes v. Chaparral Energy, LLC, 180 F. Supp. 3d 902, 915 (N.D. Okla. Mar. 29, 2016), rev'd and vacated as moot sub nom. Hayes v. Osage Minerals Council, 699 Fed. Appx. 799 (10th Cir. 2017) ("Hayes I"). The Tenth Circuit later vacated the district court's orders, finding that "the BIA's new NEPA analysis mooted [the] appeal . . . ." Hayes v. Osage Minerals Council, 699 Fed. Appx. at 803. Now, Hayes brings this action, arguing that the BIA's new NEPA analysis, a Programmatic Assessment for Leasing Activities ("Leasing PEA") and resulting Finding Of No Significant Impact ("FONSI"), that mooted the appeal in Hayes I, is itself flawed and should be vacated.

Hayes commenced this action against Sally Jewell,[1] in her official capacity as Secretary of the United States Department of Interior; the United States Bureau of Indian Affairs, an agency within the United States Department of Interior; Michael Black, in his official capacity as Director of the United States Bureau of Indian Affairs (collectively, "the government"); as well as private actors Warrior Exploration & Production, LLC; and Performance Group, LLC (collectively, "non-federal defendants"), alleging violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 (2018) under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), as well as common law claims of trespass. Pl.'s Opening Br. at 1, ECF No.

---

[1] Under Fed. R. Civ. Pro. 25(d), current government official Deb Haaland, Secretary of the Department of the Interior, is automatically substituted for the former Secretary of the Interior. Additionally, Darryl LaCounte, Director of the BIA, is automatically substituted for the former Director of the BIA. This is true throughout the opinion for other government officials sued in their official capacity.

47 (Apr. 14, 2017) ("Hayes Br.").  In addition to these claims, before the court is a motion by the government to dismiss certain claims on mootness grounds under Fed. R. Civ. P. 12(b)(1).  Def.'s Mot. to Partially Dismiss on Mootness Grounds, ECF No. 94 (May 5, 2023) ("Gov. Mootness Br.").

For the forgoing reasons, the court concludes that the BIA failed to comply with NEPA.  Accordingly, applying the APA to the Leasing PEA and resulting FONSI, the court concludes that they were arbitrary and capricious.  The court also concludes, however, that several of Hayes' other claims were not exhausted and others are moot after the BIA's recent publication of an Environmental Impact Statement ("EIS").  Finally, the court concludes that Hayes' claim for common law trespass fails.

## BACKGROUND

### I.    Statutory Framework

"The twin aims of NEPA are to require agencies to consider every significant aspect of the environmental impact of a proposed action and to facilitate public involvement."  High Country Conservation Advocs. v. U.S. Forest Serv., 951 F.3d 1217, 1223 (10th Cir. 2020) (internal quotation marks and citations omitted).  "NEPA creates 'a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, and that provide for broad dissemination of relevant environmental information.'"  Id. (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)).

Specifically, "NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts . . . ."  New

Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 703 (10th Cir. 2009).  Depending on the scope of the project, agencies must consider the likely environmental impacts at a project-wide, and site-specific, level.  See Richardson, 565 F.3d at 716–19 (analyzing in which situations agencies can defer site-specific analysis); see also 40 C.F.R. § 1501.11 (2022)[2] (encouraging agencies to wait to conduct site-specific analysis until the location of potential impacts of an action are sufficiently definite).

Federal agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); Richardson, 565 F.3d at 703.  An EIS sets out reasonable planning alternatives for a proposed action, generally including a "preferred alternative," and analyzes the environmental impacts of each.  40 C.F.R. § 1502.14 (2022).  Where it is unclear what a federal action's impact will be, or where actions are not likely to significantly affect the quality of the human environment, agencies may prepare an Environmental Assessment ("EA") prior to commissioning an EIS.  Id. § 1501.3 (2022).  Both an EA and an EIS must consider a range of reasonable alternatives, see id. §§ 1501.5(c)(2), 1502.14, but the depth of discussion and analysis required for an EIS is more extensive than for an EA.  See e.g., Western Watersheds Project v. BLM, 721 F.3d 1264, 1274 (10th Cir. 2013).

---

[2] The Council on Environmental Quality updated the regulations implementing NEPA in 2020.  Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (Council on Environmental Quality July 16, 2020).  The court refers to the regulations as effective in 2016 when interpreting the BIA's prior action, and the regulations as effective in 2022 when referring to NEPA generally.

If an agency determines, after preparing an EA, that the action will not have significant effects on the quality of the human environment, the agency may issue a FONSI. <u>Richardson</u>, 565 F.3d at 703; 40 C.F.R. §§ 1501.5, 1501.6 (2022). A FONSI may eliminate the need to conduct an EIS. 40 C.F.R. § 1501.6 (2022). But, if it becomes apparent that the action is likely to have a significant impact, an EIS must be prepared. <u>Richardson</u>, 565 F.3d at 703.

## II.     The Land at Issue and <u>Hayes I</u>

Hayes is the owner of the surface rights to approximately 475 acres of land in Osage County. Hayes Br. at 5. The subterranean rights of that land, however, are held in trust by the Osage Nation and managed by the Osage Agency within the BIA. Act of June 28, 1906, Pub. L. No. 59-321, § 3, 34 Stat. 539, 543–44.

In early 2012, the Osage Nation and Chaparral Energy, LLC ("Chaparral") entered into an oil and gas mining lease ("Lease 22411") for mineral rights located beneath the Hayes estate. <u>Administrative Record</u> at 577–79, ECF Nos. 31–42 (Mar. 15, 2017) ("AR"). Shortly thereafter, the Superintendent of the Osage Agency approved Lease 22411 without conducting a NEPA analysis. <u>Id.</u> Later that year, Chaparral submitted applications for drilling permits ("APDs") for six oil wells and one saltwater disposal well pursuant to Lease 22411, and the BIA approved each APD, again without conducting a NEPA analysis. Hayes Br. at 5; Federal Defs.' Resp. Br. at 7, ECF No. 54 (May 25, 2017) ("Gov. Br.").

In early January 2013, the Osage Nation and Chaparral entered into a second oil and gas mining lease ("Lease 22770"), also for additional mineral rights beneath

5

the Hayes estate.  AR at 749–51.  The Superintendent of the Osage Agency approved Lease 22770, again without conducting a NEPA analysis.  Id.  In 2014 Chaparral submitted and the Superintendent approved two APDs for wells pursuant to Lease 22770 without conducting a NEPA analysis.  Hayes Br. at 6; Gov. Br. at 7.

By October 31, 2014, nine wells were produced on land covered by Lease 22411, and two were produced on land covered by Lease 22770.  AR at 660, 670.  On October 26, 2015, Chaparral conveyed the leases to Warrior Exploration & Production, LLC ("Warrior").  AR at 608, 829.

Previously, in August 2014, Hayes commenced an action against the government and the non-federal defendants, alleging various environmental violations under federal law and trespass under the common law of Oklahoma.  Hayes I, 180 F. Supp. 3d at 905.  On March 29, 2016, the court issued an opinion and order[3] finding that the BIA's approval of leases and drilling permits failed to comply with NEPA, invalidating the permits to drill on the leased premises, and remanding the matter to the BIA.  Hayes I, 180 F. Supp. 3d at 915.  Hayes I would later be overturned in 2017 by the Tenth Circuit due to mootness, after the BIA retroactively approved Leases 22411 and 22770 based on subsequent NEPA analysis.[4]  Hayes v. Osage Minerals Council, 699 Fed. Appx. 799, 803 (10th Cir. 2017).

---

[3] This was the second amended opinion and order.  The first opinion was Hayes v. Chaparral Energy, LLC, No. 14-CV-495-GKF-PJC, (N.D. Ok. Dec. 21, 2015), followed by an amended opinion and order, Hayes v. Chaparral Energy, LLC, 180 F. Supp. 3d 902 (N.D. Ok. 2016).

[4] This action was brought by Hayes to challenge the retroactive approval and subsequent NEPA analysis the Tenth Circuit relied upon to moot Hayes I.

### III.   The Leasing PEA and FONSI

####   a.  Prior to Hayes I

Shortly after the initial approval of Leases 22411 and 22770, the BIA began additional NEPA analysis: first an EIS and then an EA.  AR at 241, 446.  In 2013 the BIA started work on a Programmatic Environmental Impact Statement for Oil and Gas Production from the Osage Mineral Estate ("Osage EIS").[5]  While waiting for the completion of the Osage EIS, the BIA completed the Leasing PEA.  AR at 239–301, 699.  The BIA determined, based on the Leasing PEA, that an EIS was not required for leasing actions,[6] and on November 26, 2014, issued a FONSI.  AR at 302, 306.

####   b.  After Hayes I

On June 24, 2016, three months after Hayes I invalidated the leases due to failure to comply with NEPA, the BIA retroactively approved Leases 22411 and 22770 back to January 3, 2013, under 25 C.F.R. § 226.15(b) (2016).  AR at 699–700, 826–27.  The retroactive approvals included a new term requiring the lessee to "first obtain appropriate BIA permits before conducting any operations that would result in ground-disturbance."  AR at 699; 826.  By the time these terms and conditions were added, however, eleven wells had already been drilled on Hayes' land without site-specific analysis.  See AR at 599, 676, 689.  The court is not aware of any site-specific analysis conducted after the retroactive approval.

---

[5] The EIS was to address the agency's "oil and gas management program, [for Osage County] which encompasses approval of oil and gas leases and issuance of permits for drilling, plugging, workover operations and well conversions."  AR at 446.

[6] This finding did not cancel the work on the Osage EIS, and the final version of the Osage EIS was eventually published in October 2020.  See Gov. Mootness Br. Ex. A.

On July 22, 2016, Hayes submitted a Notice of Appeal and Petitions for Stay Pending Appeal for the June 24, 2016, decisions to the BIA, one for each retroactively approved lease.   AR at 860, 881.   On August 4, 2016, the BIA acknowledged the appeals and on August 10, 2016, amended the acknowledgement and consolidated the appeals pursuant to 25 C.F.R. § 2.18 (2016).   AR at 903–04.   Hayes submitted a Statement of Reasons to the BIA on August 22, 2016.   AR at 905–25.   Hayes argued that the BIA predetermined its NEPA analysis, that the Leasing PEA violated NEPA, that the Leasing PEA, FONSIs, and Determination of NEPA Adequacy ("DNA") were inadequate, and that the retroactive approval of the leases should be vacated.   Id. at 5.   The BIA denied the consolidated appeal.   AR at 967–75.   On September 30, 2016, Hayes filed the action currently before the court, challenging the Leasing PEA and FONSI, the retroactive approval of Leases 22411 and 22770, and other matters.   Pl.'s First Am. Compl., ECF No. 19 (Nov. 15, 2016) ("Compl.").

## JURISDICTION AND STANDARD OF REVIEW

District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."   28 U.S.C. § 1331.   "Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants."   Deakins v. Monaghan, 484 U.S. 193, 199 (1988) (citing Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (citation omitted)).   "A case becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"   Smith v. Becerra, 44 F.4th 1238, 1247 (10th Cir. 2022) (citing City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000)).   "The

crucial question is whether granting a present determination of the issues offered . . . will have some effect in the real world." Smith, 44 F.4th at 1247 (citing Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000)).  The court "take[s] a claim-by-claim approach to mootness and must decide whether a case is moot as to each form of relief sought." Robert v. Austin, 72 F.4th 1160, 1163–64 (10th Cir. 2023) (citing Smith, 44 F.4th at 1247).  "The defendant bears the burden of establishing that a 'once-live case has become moot.'" Smith, 44 F.4th at 1247 (citing West Virginia v. Env't Prot. Agency, 142 S.Ct. 2587, 2607 (2022).

"With respect to injunctive relief and the question of mootness, past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." Chihuahuan Grasslands All. V. Kempthorne, 545 F.3d 884, 891 (10th Cir. 2008) (quoting Beattie v. United States, 949 F.2d 1092, 1094 (10th Cir. 1991)) (internal quotations omitted).  It follows that when a plaintiff's claims are limited to equitable relief, a plaintiff must "demonstrate a good chance of being likewise injured in the future." Beattie, 949 F.2d at 1093 (quoting Facio v. Jones, 929 F.2d 541, 544 (10th Cir. 1991)).

It is well established that what makes a declaratory judgment action "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute which affects the behavior of the defendant toward the plaintiff." Hewitt v. Helms, 482 U.S. 755, 761 (1987) (emphasis in the original). Where a plaintiff seeks both an injunction and declaratory relief, "the [d]istrict

9

[c]ourt ha[s] '[a] duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of [an] injunction.'" <u>Jordan v. Sosa</u>, 654 F.3d 1012, 1025 (10th Cir. 2011) (quoting <u>Super Tire Eng'g Co. v. McCorkle</u>, 416 U.S. 115, 121 (1974)).  The Tenth Circuit requires that the court "look beyond the initial controversy which may have existed at one time and decide whether the facts alleged show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Chihuahuan</u>, 545 F.3d at 891 (quoting <u>Beattie</u>, 949 F.2d at 1094 (quotation marks omitted)).

Additionally, this court has supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III" of the Constitution.  28 U.S.C. § 1367(a).  Supplemental jurisdiction includes claims arising from joinder. <u>Id.</u> Therefore, this court has supplemental jurisdiction over the state law claim of trespass arising out of the lease disputes.

## DISCUSSION

## I. Jurisdictionally Barred Claims

In the complaint, Hayes asked for over ten different forms of relief, in the form of an injunction, a declaratory statement, and "reasonable costs, litigation expenses and attorney fees . . . and further relief as the court deems equitable, proper, and just." Compl. at ¶ K.  The government argues that many of the claims alleged are now moot.  <u>See</u> Gov. Mootness Br.  Additionally, the government contends that

certain claims were not exhausted before the agency and thus the court does not have jurisdiction under the APA to review the claims. Gov. Br. at 30–32. As jurisdiction is a threshold issue, the court first addresses these arguments.

### A. Claims Barred by Failure to Exhaust

#### a. The challenge to the initial APDs was not exhausted before the agency and cannot be considered

Before this court, Hayes argues that the APDs[7] were arbitrary and capricious as no drilling authorizations included any site-specific analysis and no subsequent analysis was done to retroactively approve the APDs. Hayes Br. at 30. The government, however, argues that Hayes failed to administratively exhaust the remedies available at the agency level and claims sovereign immunity. Gov. Br. at 30–33.

It is well settled that the federal government may be sued only to the extent it waives sovereign immunity. United States v. Sherwood, 312 U.S. 584, 586 (1941). The APA serves as a limited waiver of sovereign immunity but limits judicial review to "final agency action." 5 U.S.C. § 704; Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 882 (1990). Absent "final agency action," sovereign immunity is not waived. Id. Agency action is not "final" for purposes of § 704, however, until "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 n.9 (10th Cir. 2005)

---

[7] This analysis will not include Well 2-36, as all parties concede the claims surrounding that particular APD are moot. See Hayes Mootness Br. at 3.

(citing <u>Darby v. Cisneros</u>, 509 U.S. 137, 146 (1993)).  Where exhaustion is required by agency rule, the APA requires that the challenged agency action remain "inoperative" pending that review in order to remain non-final.  <u>See</u> 5 U.S.C. § 704; <u>Darby</u>, 509 U.S. at 154.

Here, BIA regulations allow for intra-agency review of all decisions and orders made by the Superintendent and require exhaustion of these procedures as a prerequisite to APA review.  25 C.F.R. § 2.6(a) (2016); <u>see also</u> <u>Coosewoon v. Meridian Oil Co.</u>, 25 F.3d 920, 924 (10th Cir. 1994).  Additionally, challenged agency actions are not effective until the conclusion of the appeal.  <u>See</u> 25 C.F.R. § 2.6(b) (2016).  Accordingly, decisions by the Superintendent of the Osage Agency must be appealed to the Secretary to constitute final agency action for purposes of judicial review under the APA.  <u>See</u> <u>Coosewoon</u>, 25 F.3d at 925; <u>see e.g.</u>, <u>Osage Producers Ass'n v. Jewell</u>, 191 F. Supp. 3d 1243, 1251 (N.D. Okla. June 1, 2016).

Here, the APDs were approved by the Superintendent but Hayes did not appeal them to the Secretary.  <u>See</u> AR at 1390; <u>see also</u> Pl.'s Reply to Federal Defs.' Resp. Br. at 12–14, ECF No. 57 (June 2, 2017) ("Hayes Reply Br.").  Ergo, Hayes did not exhaust remedies with respect to approval of the APDs.  Hayes contends that the court should excuse the exhaustion requirement.  Hayes Reply Br. at 13.  Exhaustion under the APA, however, is a statutory requirement.  <u>See</u> <u>Darby</u>, 509 U.S. at 146–47.  The court may not read exceptions into the statute not expressly provided by Congress.  <u>See</u> <u>Booth v. Churner</u>, 532 U.S. 731, 741 n.6 (2001); <u>Osage Producers Ass'n</u>, 191 F. Supp. 3d at 1254–55.  Because Hayes failed to exhaust remedies as to the

approval of the APDs, the approvals here are not "final" and thus not subject to judicial review under the APA.  This claim will be dismissed.

**B. Moot Claims**

<u>a.</u>  <u>Enjoining the Osage Agency from relying upon the Leasing PEA
and FONSI in the future is moot</u>

The government argues that Hayes' request for an order "enjoining the Osage Agency of the BIA from relying upon the Leasing PEA and the Leasing FONSI to approve any oil and gas related activity on Hayes' Property" is moot.  Mot. to Partially Dismiss on Mootness Grounds at 9, ECF No. 94 (May 5, 2023) ("Gov. Mootness Br."); Compl. at ¶ B.  The government contends that the Osage EIS supersedes the Leasing PEA and FONSI, and that the Leasing PEA and FONSI is no longer in use.  Gov. Mootness Br. at 10.   Hayes concedes that the injunctive relief for future use or reliance of the government on the Leasing PEA and FONSI is moot because the BIA will now rely on the Osage EIS.  Hayes Mootness Br. at 5–6.  Injunctive relief is by its nature relief that affects the future.  It is not retroactive.  Therefore, injunctive relief for future reliance on the Leasing PEA and FONSI is moot, and this claim will be dismissed.

<u>b.</u>  <u>Enjoining the Osage Agency from approving drilling activities on
Hayes' property until the EIS has been completed is moot</u>

The government contends that an order enjoining drilling activity "until the Osage EIS has been completed" is moot.  Gov. Mootness Br. at 15; Compl. at ¶ C.  At this time, the Osage EIS is complete, and all drilling authorizations are expired.  Gov.

Mootness Br. at 15.   25 C.F.R. § 226.16(b)(1) requires that any new drilling authorizations are analyzed under the Osage EIS.   25 C.F.R. § 226.16(b)(1) (2022); see also 40 C.F.R. § 1502.9(d) (2022); Gov. Mootness Br. at 14.   Accordingly, the claim will be dismissed.

### c.   Declaratory judgment of APD for Well 2-36 is moot

Well 2-36 was never drilled and the APD has expired.   Gov. Mootness Br. at 14; Hayes Mootness Br. at 3.   Hayes acknowledges that the challenge to Well 2-36 is moot.   Id. at 5.   This claim will be dismissed.

### d.   Declaratory judgment regarding the Workover PEA and FONSI

Hayes originally brought a claim regarding a second EA and resulting FONSI. Compl. at ¶ H (referring to approval of workover operations on wells).   Now, however, Hayes concedes that relief requested is rendered moot by the issuance of the Osage EIS because the Osage EIS will be the basis for future workover activities.   Hayes Mootness Br. at 4.   This claim will be dismissed.

## C. Remaining Claims

### a.   Declaratory judgment regarding the Leasing PEA and FONSI is not moot

The government argues that Hayes' request for a judgment declaring that "the approval by the Osage Agency Superintendent of the Leasing FONSI associated with the Leasing PEA was arbitrary and capricious" is moot.   Gov. Mootness Br. at 9; Compl. at ¶ A.   The government contends that the request for declaratory relief must be dismissed because the Osage EIS and record of decision supersede the Leasing

PEA and FONSI, and that the Leasing PEA and FONSI are no longer in use.  Gov. Mootness Br. at 10–11.  Hayes asserts that declaring the Leasing PEA and FONSI arbitrary and capricious is a live controversy because doing so will necessarily void all previous reliance on the documents, including the retroactive approval of the leases.  Hayes Mootness Br. at 7–8.  The court agrees with Hayes that the voiding of the leases is a "legally cognizable interest," and because the retroactive approvals were based on reasoning in the Leasing PEA and FONSI, there is a legally cognizable interest in examining their approval.  Thus, the declaratory relief requested under this claim will have real-world impact.  See Smith, 44 F.4th at 1247.  The claim is live.

### b.  Claims unchallenged on the basis of mootness

"The defendant bears the burden of establishing that a 'once-live case has become moot.'"  Smith, 44 F.4th at 1247 (citing West Virginia v. Env't Prot. Agency, 142 S.Ct. 2587, 2607 (2022).  The government did not challenge Hayes' second claim, requesting declaratory judgment that the retroactive approval of Leases 22770 and 224111 was arbitrary and capricious, or Hayes' fifth claim, requesting declaratory judgment that non-federal defendants trespassed under Oklahoma law.  See generally, Gov. Mootness Br.  Additionally, both claims will have a real world consequences.  Accordingly, these claims are live.

## II.   NEPA Violations

The court now turns to the surviving substantive NEPA claims brought by Hayes.  Hayes asserts that the Leasing PEA and FONSI, and the retroactive

approvals of Leases 22770 and 22411, were approved in violation of NEPA.  <u>See</u> Hayes Br. at 1.  Leasing Osage mineral rights and any oil and gas activities regarding those rights requires a NEPA Assessment.  25 C.F.R. § 226.2(c) (2022).  NEPA imposes procedural, information-gathering requirements on an agency to "ensure that the agency will only reach a decision on a proposed action after carefully considering the environmental impacts of several alternative courses of action and after taking public comment into account."  <u>Forest Guardians v. U.S. Fish and Wildlife Serv.</u>, 611 F.3d 692, 717 (10th Cir. 2010); <u>see also</u> 42 U.S.C. § 4332(C).  This procedural step requires a comprehensive "hard look" that must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.  <u>Forest Guardians</u>, 611 F.3d at 712. (citing <u>Metcalf v. Daley</u>, 214 F.3d 1135, 1142 (9th Cir. 2000)).

NEPA does not provide a private right of action; rather Hayes brings a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  40 U.S.C. §1500.3(d).  Therefore, the court reviews an agency's NEPA compliance to determine whether the agency's actions were "arbitrary, capricious, or otherwise not in accordance with the law."  5 U.S.C. §706(2)(a).  The Tenth Circuit holds an agency is arbitrary and capricious in its NEPA compliance if the agency:

> (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear

error of judgment.

New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 704 (10th Cir. 2009) (quoting

Utah Env't. Cong. v. Troyer, 479 F.3d 1269, 1280 (10th Cir. 2007)) (quotations

omitted).

### A. The Leasing PEA and FONSI were arbitrary and capricious due to the lack of site-specific analysis

Hayes makes several arguments regarding the validity of the Leasing PEA and

resulting FONSI.   Hayes Br. at 9–26.   The court, however, addresses only the

arguments regarding the need for site-specific analysis as that deficiency alone is

sufficient to invalidate the Leasing PEA and the retroactive approval that relied upon

it.   The completed EIS moots future use of the Leasing PEA and thus the potential

supplementation and use of the Leasing PEA.

Hayes argues that the standard set by Richardson required the BIA to conduct

site-specific analysis in the Leasing PEA in order to satisfy NEPA's requirement that

the agency take a "hard look" at environmental impacts.   Hayes Br. at 12–16; 565

F.3d at 718.   The government contends that site-specific analysis was not required,

and that the case at hand is distinguishable from Richardson as it is more similar to

Park County Resource Council, Inc. v. United States Dept. of Agriculture, 817 F.2d

609 (10th Cir. 1987), overruled in part on other grounds by Village of Los Ranchos de

Albuquerque v. March, 956 F.2d 970 (10th Cir. 1992).   Specifically, the government

argues that because the Leasing PEA required future APDs to include a site-specific

EA, the Leasing PEA merely assessed a project that was "administrative in nature and [did] not provide for ground disturbance . . . ." Gov. Br. at 14.

In the Tenth Circuit, there is no bright-line rule as to when site-specific environmental analysis must occur in the oil and gas leasing context. See Richardson, 565 F.3d at 717–18. In some cases, it must take place at the leasing stage, see id. at 718–19, and in others, it is appropriate to wait until the development stage, see Park County, 817 F.2d at 623–24. The important question the court must answer is whether "all reasonably foreseeable impacts" were assessed "at the earliest practicable point . . . before an irretrievable commitment of resources [was] made." Richardson, 565 F.3d at 718.

To answer this question, first the court must determine whether an irretrievable commitment of resources was made. In Richardson, the court concluded that "issuing an oil and gas lease without a [no surface occupancy] stipulation constitutes such a commitment." Id. at 817. Specifically, the leases in Richardson gave lessees the "right to . . . explore for, drill for, mine, extract, remove and dispose of all the leased resource" which led the court to conclude site-specific analysis was necessary at the leasing stage. Id. at 718–19. The court in Park County applied similar reasoning despite coming to a different conclusion. 817 F.2d at 624. In Park County, the leases held a stipulation requiring "further environmental appraisal before any surface disturbing activities commence[d] . . . ." Id. Additionally, the leases required a survey for any endangered plant or animal species; restricted certain areas for parts of the year to protect habitats and recreation; and when the

lessee did apply for a drilling permit, the agency announced it would prepare an EIS with respect to the submitted APD.  Id. at 613.

Here, the Leasing PEA walks the line between the facts of Richardson and Park County.  Although the Leasing PEA includes language prohibiting "surface disturbance of any kind" until "all required clearances, consultations, determinations, easements, leases, permits, and surveys are in place, if deemed appropriate," there is no stipulation specifically requiring a site-specific EA prior to surface disturbing activities.  Leasing PEA at 4.  Rather, the Leasing PEA only requires a lessee to demonstrate compliance with NEPA prior to the issuance of an APD.  Id.  The retroactive approval of the leases in question similarly provides some protections, requiring the lessee to obtain a site-specific EA prior to conducting any operations that would result in "ground-disturbance."  AR at 699.  The approval, however, does not address the circumstance at hand where the "ground-disturbance" in question, drilling of wells, had already happened under the previously vacated lease.  AR at 700.

The Leasing PEA did not sufficiently protect against the irretrievable commitment of resources.  As in Richardson, the Leasing PEA does not include a No Surface Occupancy stipulation, instead it requires the lessee to obtain the correct approvals and permits.  AR at 239–301.  Nowhere, however, does the Leasing PEA or the retroactive approval of the leases specify that these approvals would include a site-specific EA prior to surface occupancy.  To the contrary, the leases in question provide that the oil and gas lessee "shall have the right to use so much of the surface

land within the Osage Mineral Estate as may be reasonable for operations and marketing." AR at 577–80, 749–52. This includes the right to "lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations . . . ." Id. The language in the retroactive approval prohibiting development that has a significant adverse or irreversible impact to critical resources is insufficient to ensure these activities will not occur prior to the proper site-specific analysis.

As there was sufficient potential for an irretrievable commitment of resources, the court now turns to whether the Leasing PEA examined "all reasonably foreseeable impacts . . . at the earliest practicable point." Richardson, 565 F.3d at 718. In Richardson, the court noted that considerable exploration had already been done on parcels adjacent to the one being leased, that a natural gas supply was known to exist below those parcels, and that the record showed that the lessee had concrete plans to build on the parcel as well as others it already leased. Id. In contrast, in Park County, extensive drilling had not previously occurred in the area of the lease parcel in question, and historically only one in ten leases were developed. Park County, 817 F.2d at 624.

The timing of this case clearly establishes that drilling was a reasonably foreseeable impact of leasing when the Leasing PEA was in development.[8] Similar to Richardson, considerable exploration and drilling has been conducted in Osage County previously. AR 243 (noting that about 34,000 wells were drilled in Osage county between 1974 and 2014). But, at the time the Leasing PEA was published,

---

[8] In fact, drilling was already occurring.

the BIA was aware that during the term of the lease, wells had been drilled without site-specific analysis.  Id.  Hindsight being 20/20, there is no clearer example of a reasonably foreseeable impact.

The likelihood of the irretrievable commitment of resources, alongside the explicit knowledge of the impacts of leasing, meets the standard set by Richardson. Thus, the Leasing PEA required site-specific analysis, and the omission of such analysis was arbitrary and capricious.

**B. The approval of Leases 22411 and 22770 was arbitrary and capricious**

Hayes argues that the approval of Leases 22411 and 22770 was arbitrary and capricious due to the lack of site-specific analysis.  Hayes Br. at 29.  The government contends that such a requirement would constitute a gross misallocation of resources and would trivialize NEPA.  Gov. Br. at 27.  The court finds that site-specific analysis was required prior to the approval of Leases 22411 and 22770.

As explained above, Richardson requires the BIA to consider "all reasonably foreseeable impacts . . . at the earliest practicable point . . . before an irretrievable commitment of resources [is] made."  Richardson, 565 F.3d at 718.  Through the consideration and subsequent appeal process, the BIA was aware of prior APDs associated with the leases where drilling had begun.  Accordingly, the BIA had a responsibility to confirm that a site-specific analysis was undertaken to ensure NEPA compliance.  While the BIA included specific language in the terms and conditions requiring the lessee take certain measures prior to future ground-disturbance, the leases are silent on requirements with respect to ground-disturbance that had

already occurred.  See AR at 577–79; 749–51.  In the case where the BIA seeks to retroactively approve a lease and knows of prior actions that do not comply with the terms and conditions that ensure NEPA compliance, the BIA has an obligation under NEPA to include additional terms to remedy that default.[9]  Not to do so is arbitrary and capricious. [10]

Assuming arguendo that the site-specific analysis was conducted, the BIA retains the authority to retroactively approve major federal actions.  Hayes argues that on its face, NEPA prohibits retroactive approval of major federal action.  Hayes Br. at 30.  The government asserts that no language in NEPA supports Hayes' claim, and points to caselaw where courts have allowed projects to go forward while an agency remedies NEPA deficiencies with supplemental analysis as evidence that retroactive approval is allowed.  Gov. Br. at 28.

---

[9] NEPA requires environmental analysis of the foreseeable direct, indirect, and cumulative impacts of a major federal action.  Richardson, 565 F.3d at 719 n.45 (citing 40 C.F.R. § 1508.25(c) (2009)).  It follows that, when retroactively approving a lease, foreseeable impacts include impacts from all actions (including drilling) that were taken pursuant to that lease during the period being retroactively approved.

[10] Hayes contends that Osage regulations specifically provide that site-specific analysis shall occur prior to the approval to a lease.  Hayes Br. at 30 (citing 25 C.F.R. § 226.2(c) (2017)).  This is not so.  The relevant regulation states that "[e]ach oil and/or gas lease and activities and installations associated therewith subject to these regulations shall be assessed and evaluated for its environmental impact prior to its approval by the Superintendent."  25 C.F.R. § 226.2(c) (emphasis added).  A plain reading of this language does not support Hayes' conclusion that site-specific analysis is required.  In the light of the Tenth Circuit's opinion in Park County, the requirement to assess and evaluate a lease's environmental impact prior to approval cannot be read to require site-specific analysis.  See Park County, 817 F.2d at 623 (allowing for certain procedural steps to be deferred beyond the leasing stage when development is sufficiently tentative).

The government is correct that on its face NEPA does not prohibit retroactive approval.  Hayes fails to point to any specific language prohibiting retroactive approval.  See Hayes Br. at 29–30.  Additionally, the Tenth Circuit mooted the claims related to the leases in Hayes I due to the retroactive approval, an action that likely would not have occurred if retroactive approvals were prohibited under any circumstances by NEPA.

Nevertheless, retroactive approvals are examined through a microscope due to the risk of predetermination.  Under the doctrine of predetermination, a NEPA analysis must be "prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made . . . ."  40 C.F.R. § 1502.5 (2016); see also Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d 692, 712 (10th Cir. 2010). NEPA does not require, however, "agency officials to be 'subjectively impartial'" while preparing the environmental analysis.  Forest Guardians, 611 F.3d at 712 (quoting Env't Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army, 470 F.2d 289, 295 (8th Cir. 1972)).  That is, an agency can have a preferred alternative in mind when conducting a NEPA analysis so long as the analysis is timely and taken objectively in good faith. Id. (quoting Metcalf, 214 F.3d at 1142).  To show predetermination, a petitioner must establish "that the agency has irreversibly and irretrievably committed itself to a plan of action that is now dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis."  Id. at 714–15 (emphasis in original).

Vacatur of prior agency action, however, complicates a predetermination analysis. In <u>Diné Citizens Against Ruining Our Env't v. Haaland</u>, the Tenth Circuit considered facts where after the Bureau of Land Management ("BLM") approved APDs, then the court vacated the EAs the APDs relied upon and required supplemental analysis, but did not vacate the APDs themselves. 59 F.4th 1016, 1031 (10th Cir. 2023). The Tenth Circuit held that by taking no new actions such as vacating the APDs while working on the supplement to the EAs, BLM "simply maintained the status quo." <u>Id.</u> Additionally, BLM "retained the authority to withdraw the APDs if its subsequent investigation uncovered more significant environmental impacts than its initial assessment." <u>Id.</u> Thus, NEPA does not strictly require an agency to reverse or vacate prior commitments while conducting analysis objectively in good faith.

Here, because the Tenth Circuit vacated the district court's order invalidating Leases 22411 and 22770, no court order invalidated the BIA's prior approval of the APDs. Accordingly, the BIA simply conducted additional analysis after approving two leases, and then retroactively approved the same leases with the addition of the new analysis. Absent a showing by Hayes that the EA was not undertaken objectively in good faith, the court cannot find the approval was predetermined. Nevertheless, the lack of site-specific analysis at or before the approval of the leases means the BIA's retroactive approval was arbitrary and capricious.

## C. Remedy

Hayes asserts the normal remedy is to vacate unlawful agency action. Hayes Br. at 31. The government, however, argues the appropriate remedy is to remand the decision to the agency, as on remand "the agency may determine that the lease was proper in the first instance, after addressing any deficiency that the court found, albeit on a different record and Environmental Assessment or Environmental Impact Statement." Gov. Br. at 34–35.

The Tenth Circuit has recently addressed the standard for deciding whether vacatur is appropriate under the APA when a NEPA violation is found. After considering the Supreme Court's jurisprudence, the Tenth Circuit adopted the test set out by the D.C. Circuit in Allied-Signal. Diné Citizens Against Ruining Our Env't v. Haaland, 59 F.4th 1016, 1049 (10th Cir. 2023) (citing Allied-Signal, Inc. v. U.S. Nuclear Regul. Com'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Under the test, "courts must consider two factors—(1) 'the seriousness of the [agency action's] deficiencies (and thus the extent of doubt whether the agency chose correctly),' and (2) 'the disruptive consequences of an interim change that may itself be changed.'" Id. (quoting Allied-Signal, 988 F.2d at 150–51). Addressing the first factor, "[w]hen an agency bypasses a fundamental procedural step, the vacatur inquiry asks not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step." Id. (quoting Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1052 (D.C.

Cir. 2021), cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe, ⎯⎯ U.S. ⎯⎯, 142 S. Ct. 1187, 212 L.Ed.2d 54 (2022)).

At this point in litigation, it is unclear whether the factors favor vacatur. The BIA skipped the important procedural step of conducting site-specific analysis at the leasing level. Further explanation will likely not justify the agency's decision to forgo its obligation to examine "all reasonably foreseeable impacts . . . at the earliest practicable point." Richardson, 565 F.3d at 718. Nevertheless, the parties have not briefed the court on the full ramifications of vacating the Leasing PEA and FONSI.

Simple vacatur of the leasing PEA and FONSI may be too broad, or too narrow. On one hand, it is unknown how many leases and permits in Osage County rely on the Leasing PEA and FONSI, and how many were approved without site-specific analysis. On the other hand, vacating might be promptly mooted by reliance on the EIS. The parties have not sufficiently briefed whether the Osage EIS contains the requisite site-specific analysis or whether the BIA has taken new steps to ensure a leasing-only EIS is sufficiently supplemented with site-specific analysis at the APD stage.

The parties are hereby directed to consult and submit a briefing schedule addressing the appropriate remedy within 20 days hereof. Specifically, the court directs the parties to brief the Allied-Signal factors as applied by the Tenth Circuit, the extent to which the BIA may supplement its NEPA analysis on remand, and

whether the Osage EIS contains the same deficiencies identified in the Leasing PEA and FONSI.[11]

### III.   Trespass

Hayes asserts that the non-federal defendants are trespassing under Oklahoma law on Hayes' land because the leases that the operators have are invalid. Compl. ¶¶ 20, 140–46.  Hayes requests that the court enter declaratory judgment that the Operator Defendants' activities on the Hayes land since September 1, 2015, constitutes trespass.  Compl. at ¶ 145.

Warrior argues that the administrative record contains no evidence of trespass.  Answer Br. of Non-Federal Defs. at 4, ECF No. 52 (May 5, 2017) ("Warrior Ans.") at 4.  Additionally, Warrior asserts that cancellation of leases cannot establish trespass after the fact, and that even if the approvals of the leases were ineffective, non-federal defendants were acting under claim and color of right derived from leases executed by the mineral owner.  Id. at 4–5.[12]

Oklahoma law provides that when a person seeks damages under the tort of trespass, it matters whether the person is acting in good faith.  See Dilworth v. Fortier, 405 P.2d 38, 45 (Sup. Ct. Ok. 1964) ("[T]he proof must show some elements

---

[11] To the extent the parties believe it relates to the facts of this case, the parties should consider the discussion of Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010) in Diné Citizens Against Ruining Our Env. v. Haaland, 59 F.4th 1016, 1049–50 (10th Cir. 2023).

[12] Warrior also contends that Hayes had consented to entry by these defendants and was compensated for said entry.  Warrior Br. at 5.  As Warrior's first argument successfully dispenses with the trespass claim, the court need not reach this question here.

of fraud, malice or oppression.  The act which constitutes the cause of action must be actuated by or accompanied with some evil intent, or must be the result of such gross negligence . . . as is deemed to be equivalent to the intent." (quoting <u>Barnes v. Winona Oil Co.</u>, 200 P. 985, 987 (Sup. Ct. Ok. 1921))).  <u>Dilworth</u> references an earlier case, <u>Barnes v. Winona Oil Co.</u>, 200 P. 985 (Okla. 1921) in which an oil and gas lease was found to be invalid after the fact.  There, the court determined:

> 'where a lessee, with no intention to violate any law or do any wrongful act, takes possession of land under a lease owned by him, and in good faith, believing in his title, proceeds to develop the premises for oil and gas purposes, and it later develops that his lease was invalid,' the measure of damages would be the price of the oil or gas at the surface or in the pipe line less the cost of producing the same.

<u>Barnes v. Winona Oil Co.</u>, 200 P. 985 (Okla. 1921).

The court finds these cases persuasive.  The rationale that a lessee should not be punished for good faith reliance on a lease should be applied to this case. Hayes produced no evidence on the record to conclude that Warrior and other Operator Defendants had malicious intent.  Rather, the evidence demonstrates that the Defendants were simply operating according to their lease.  Therefore, declaratory relief is inappropriate.

## CONCLUSION

For the foregoing reasons, this court **DISMISSES** the claims found to be moot, **DISMISSES** the claims not exhausted at the agency level, **DISMISSES** the claim of trespass, and **DECLARES** the Leasing PEA, FONSI, and the retroactive approvals of Leases 22411 and 22770 arbitrary and capricious.  Consistent with this opinion, the court **ORDERS** additional briefing on remedies.

/s/ Jane A. Restani
Jane A. Restani, Judge

Date:  November 7, 2023
New York, New York

29